UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALBERT LEE ST. CLAIR, JR.,

     Plaintiff,

v.                                  Case No. 8:21-cv-168-WFJ-UAM

DEANGELO M. ANTHONY, *et al.*,

     Defendants.

_____/

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. (Docs. 110, 115). Plaintiff Albert Lee St. Clair, Jr. has responded in opposition, and Defendants have replied. (Docs. 111, 112). The Court heard oral argument on the Motion and received supplemental briefs from the parties. (Docs. 118, 121, 122). Upon careful consideration, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment.

## I.    Background

### A. Facts

This civil-rights action arises from the arrest of Mr. St. Clair after he stole a government vehicle and engaged the police in two car chases. On the morning of April 8, 2019, Mr. St. Clair stole an unoccupied pickup truck in Polk County, Florida. (Doc. 110-5 at 21, 25). The truck belonged to the City of Lakeland and was hitched to a trailer that contained "lawn equipment." (*Id.* at 24, 28). Mr. St. Clair drove the truck to neighboring Hillsborough County, where he went "joyriding" and led police on what he later described

as a "small chase." (*Id.* at 21-22). Law enforcement ultimately called off the pursuit, and Mr. St. Clair made his way back to Polk County. (*Id.* at 31-32).

As he approached the Polk County line, Mr. St. Clair looked back and saw "three or four" Lakeland Police vehicles with their emergency lights on. (*Id.* at 33, 35). Mr. St. Clair did not pull over. Instead, he "started going fast" and led police on a roughly fourteen-minute chase. (*Id.* at 33, 35-36; *see also* Doc. 108-1, Peterman Dashcam Video). During the pursuit, Mr. St. Clair exceeded the speed limit, drove into oncoming traffic, ignored traffic signals, knocked over a garbage can, and rode over at least one median. (Doc. 110-5 at 37-38; *see also* Doc. 108-1, Peterman Dashcam Video). A review of the chase on the police dashcams shows Mr. St. Clair's behavior to be wild and reckless in the extreme. (*E.g.*, Doc. 108-1, Peterman Dashcam Video). At one point, Mr. St. Clair tried to "intimidate" a pursuing officer by changing lanes and driving toward the officer's vehicle. (Doc. 110-7 at 9-11; *see also* Doc. 108-6, Fetz Dashcam Video at 2:10-20). He later admitted to "ramm[ing]" a police car that "tried to pull [him] over" in Hillsborough County. (Doc. 110-5 at 30). Mr. St. Clair also "ate" methamphetamine during the chase to avoid police finding it. (Doc. 110-7 at 4-5).

Police attempted to deploy "stop sticks," but Mr. St. Clair eluded the first attempt by driving over the median. (Doc. 108-1, Peterman Dashcam Video at 6:20-35). On the second attempt, law enforcement succeeded in deflating the truck's tires, and the chase ended on a highway overpass. (Doc. 110-5 at 43). As the truck slowed to a crawl, Mr. St. Clair exited the vehicle and began to run. (*Id.* at 65; *see also* Doc. 108-2, Gulledge Dashcam Video at 14:21-38). Sgt. Aaron Peterman opened the driver's side door of his vehicle,

released his K-9 partner, and ordered the dog to "bite" Mr. St. Clair. (Doc. 109-14 at 3; *see also* Doc. 108-3, Martin Dashcam Video at 14:00-20). Mr. St. Clair ran for approximately thirty feet before the dog caught up with him. (Doc. 110-5 at 65; *see also* Doc. 108-2, Gulledge Dashcam Video at 14:21-38). He was standing when the dog began to bite him, but he was quickly taken to the ground—either by "the dog or the cops," according to Mr. St. Clair. (Doc. 110-5 at 68; *see also* Doc. 108-2, Gulledge Dashcam Video at 14:21-38).

The parties disagree about what happened next.[1] Mr. St. Clair's first two complaints assert he stopped and went to his knees with hands up. (Doc. 1 at 8; Doc. 9 at 15). This is plainly refuted by the dashcam footage, which shows him fleeing from the K-9. (Doc. 108-1, Peterman Dashcam Video at 15:00-15; Doc. 108-2, Gulledge Dashcam Video at 14:21-38). At the point the dog is preparing to latch on, the activity moves off camera. (Doc. 108-2, Gulledge Dashcam Video at 14:21-38). At his deposition, Mr. St. Clair testified that he immediately "gave up" and "wasn't resisting." (Doc. 110-5 at 67, 69). Despite his lack of resistance, officers allegedly "swarm[ed] around" him and began punching him in the face. (*Id.* at 57-59). Mr. St. Clair testified that the punches continued even after he was handcuffed and had screamed, "You're killing me, you're hurting me." (*Id.* at 23, 57). He also stated that officers "beat[] [him] with batons" and kept "whacking" and "hitting" him. (*Id.* at 70). Furthermore, one officer allegedly "kicked [him] in the testicles after [he] had the handcuffs on." (*Id.* at 23). In Mr. St. Clair's telling, the encounter lasted approximately

---

[1] Defendants' dashcam footage depicts the car chase in Polk County, the end of the pursuit on the highway overpass, and Mr. St. Clair's attempt to flee on foot. But the footage does not show the officers' physical apprehension of Mr. St. Clair once the K-9 caught up with him and he stopped running.

fifteen to twenty seconds, the handcuffs "were on [him] within the first couple seconds," and the dog bit him for five to ten seconds.[2] (*Id.* at 62, 95). Mr. St. Clair also estimated that he was struck approximately thirty times. (*Id.* at 62).

Defendants offer a different version of the arrest. Officer Zachary Simmons, for example, claims that Mr. St. Clair was "non-compliant" throughout the encounter, "refus[ing] to permit officers to place his hands in handcuffs." (Doc. 109-15 at 3). According to Officer Simmons, he struck Mr. St. Clair's right arm two or three times in an effort to "gain control of [Mr.] St. Clair's hands." (*Id.*) Several other officers submitted affidavits describing their role in the arrest. All claim to have used physical force against Mr. St. Clair only because he was non-compliant and resisting arrest:

- Officer Eric Strom states that he held Mr. St. Clair's legs in place to prevent his "active[] resist[ance]." (Doc. 109-17 at 3).

- Officer DeAngelo Anthony recounts delivering "approximately four knee strikes to [Mr.] St. Clair's right leg in an effort to distract him from his efforts to resist." (Doc. 109-1 at 3).

- Officer Derek Gulledge claims that he "kicked [Mr. St. Clair] one time in the right shoulder" after observing him "tens[e], brac[e], and refus[e] to place his hands behind his back." (Doc. 109-4 at 3).

- Officer Nicholas Rex describes "deliver[ing] two closed fist strikes to [Mr.] St. Clair's face in an effort to distract him from his efforts to resist." (Doc. 109-19 at 2).

- Officer Justin King claims that, in order to "gain compliance," he "delivered two closed-hand compliance strikes to [Mr.] St. Clair's head with [his] right hand." (Doc. 109-18 at 3).

---

[2] Sgt. Peterman estimated that the dog held the bite for "approximately fifteen to thirty seconds." (Doc. 109-14 at 3).

- Sgt. Peterman avers that, after the K-9 bit Mr. St. Clair's left arm, he "directed [Mr.] St. Clair to the ground" and "attempted to get [Mr.] St. Clair's hands behind his back" while the latter "continued to resist by tucking his right arm underneath his body." (Doc. 109-14 at 3).

After Mr. St. Clair was subdued and handcuffed, he was placed in the back of a patrol vehicle and driven to Lakeland Regional Health, a nearby hospital. (Doc. 110-5 at 84-85, 87). According to Mr. St. Clair, he arrived at the hospital within ten to twenty minutes of his arrest. (*Id.* at 87). There, he was treated for his dog bite, receiving sutures for a 4.3-centimeter laceration on his left arm. (Doc. 110-2 at 13). The examining physician noted "bruising to the right side of [Mr. St. Clair's] face," but found "no bleeding" in his mouth and "no bleeding, [] tenderness, [] or swelling" in his nose. (*Id.* at 14, 17). A CAT scan of Mr. St. Clair's head "was negative," although the "evaluation [was] limited" because Mr. St. Clair was moving around during the procedure. (*Id.* at 17, 19). Mr. St. Clair was released from the hospital after a "couple [of] hours" and taken to the jail for booking. (Doc. 110-5 at 91).

At his deposition, Mr. St. Clair claimed to have suffered several arrest-related injuries that are not reflected in his hospital records. Specifically, he testified that "he lost a lot of teeth," his nose was broken, his eyes were swollen shut, "some" ribs were broken, and one of his testicles was "swoll[en] up real bad." (*Id.* at 24, 81-83). According to Mr. St. Clair, a doctor at "the county jail" told him that his ribs "were broken," and either a doctor or a nurse at the jail said his kidney was "probably bruised." (*Id.* at 82-83). A tape of Mr. St. Clair in the back seat of the police cruiser after his arrest does not show many of

these claimed injuries and appears consistent with the hospital records. (Doc. 108-4, Martin Dashcam Video at 20:00-27:46).

Mr. St. Clair ultimately pled *nolo contendere* to five charges stemming from the April 8, 2019 incident—grand theft of a motor vehicle, fleeing or attempting to elude a law enforcement officer, burglary of a conveyance, resisting officers with violence, and aggravated assault on a law enforcement officer. *State v. St. Clair*, No. 2019-CF-003108, Doc. 173 (Fla. 10th Jud. Cir. Ct. Oct. 24, 2022). He received a total sentence of seventy-two months in prison. *Id.*

### B. Procedural History

Proceeding *pro se*, Mr. St. Clair brought this action under 42 U.S.C. § 1983. (Doc. 1). He later obtained *pro bono* counsel[3] and filed a second amended complaint, the operative pleading in this action. (Doc. 89). Mr. St. Clair sues the seven officers who admit to having used force against him during his arrest—Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom. (*Id.* at 1). He also names as Defendants three officers who observed his arrest but claim not to have used any force against him—Officers Justin Claxon, Derek Martin, and Sean Mulderrig. (*Id.*; Doc. 109-2 at 2-3; Doc. 109-11 at 2-3; Doc. 109-13 at 2-3). The eleven remaining Defendants are members of the Lakeland Police Department who were involved in the investigation or pursuit of Mr. St. Clair but

---

[3] *Pro bono* counsel Carmen Cato and Scott McLaren of Hill Ward Henderson are providing excellent services to their indigent client in the highest tradition of the Bar.

did not witness his arrest.[4] (Doc. 109-3 at 3; Doc. 109-5 at 2; Doc. 109-6 at 2; Doc. 109-7 at 2; Doc. 109-8 at 2; Doc. 109-9 at 3; Doc. 109-10 at 2; Doc. 109-12 at 2; Doc. 109-16 at 2; Doc. 110-4 at 14).

In the second amended complaint, Mr. St. Clair brings three claims against each Defendant: a Fourth Amendment excessive-force claim, a Fourth Amendment claim for failure to intervene in the alleged excessive force, and a Fourteenth Amendment claim for deliberate indifference to serious medical needs. (Doc. 89 at 7-10).

Following discovery, Defendants moved for summary judgment. (Docs. 110, 115). They argue that Mr. St. Clair fails to raise a triable issue of fact as to whether any Defendant used excessive force against him, failed to intervene in the alleged excessive force, or displayed deliberate indifference to his serious medical needs. (Doc. 110 at 6). They also maintain that each Defendant is entitled to qualified immunity. (*Id.*)

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

---

[4] These Defendants are Public Safety Aid Brooke Mort and Officers Dustin Fetz, David Guptill, Nicholas Harrison, Warren Hutton, Joseph Jano, Kenneth Jones, Parker Kellerman, Charlene Liberty, Jack Sirera, and Jaime Smith (Doc. 89 at 1).

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587.

## III.   Discussion

The Court proceeds in three parts. First, the Court considers whether Defendants are entitled to summary judgment on the excessive-force claim. A reasonable jury could conclude that the seven officers who admit to striking or otherwise touching Mr. St. Clair violated his clearly established right to be free from excessive force. Accordingly, those

Defendants—Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom—are not entitled to qualified immunity for the force they used in physically apprehending Mr. St. Clair. The remaining Defendants are, however, entitled to qualified immunity on the excessive-force claim, and the Court grants summary judgment to Sgt. Peterman for his decision to deploy the K-9. Second, the Court holds that Mr. St. Clair fails to raise a triable issue as to whether any Defendant violated his rights by failing to intervene in the alleged excessive force. Third, the Court concludes that Mr. St. Clair fails to create a genuine dispute of material fact as to whether any Defendant displayed deliberate indifference to his serious medical needs.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citations and internal quotation marks omitted). To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citations and internal quotations omitted). Once this showing is made, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Id.* at 1340-41.

There is no dispute that Defendants acted within the scope of their discretionary authority at all relevant times. Accordingly, the Court considers whether Defendants

violated Mr. St. Clair's constitutional rights and, if so, whether those rights were clearly established at the time.

## A. Excessive Force

"Freedom from unreasonable searches and seizures under the Fourth Amendment encompasses the right to be free from excessive force during the course of a criminal apprehension." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015). Courts "judge excessive force claims under the Fourth Amendment's objective reasonableness standard." *Id.* (citation omitted). "That standard asks whether the force applied is objectively reasonable in light of the facts confronting the officer, a determination [courts] make from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight." *Id.* (citation omitted). In applying this test, courts consider a number of factors, including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether he is actively resisting arrest or attempting to evade arrest by flight," (4) "the need for the application of force," (5) "the relationship between the need and amount of force used," and (6) "the extent of the injury inflicted." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)).

### 1.  Use of Force During the Arrest

As noted above, seven officers—Anthony, Gulledge, King, Peterman, Rex, Simmons, and Strom—admit that they struck or otherwise touched Mr. St. Clair during his arrest. (Doc. 109-1 at 3; Doc. 109-4 at 3; Doc. 109-14 at 3; Doc. 109-15 at 3; Doc. 109-17 at 3; Doc. 109-18 at 3; Doc. 109-19 at 2). The officers claim that they applied a limited

amount of force to Mr. St. Clair because he was non-compliant and resisting commands. (*Id.*) None of these events were taped: the Lakeland Police Department did not use body cameras at this time, and none of the dash cameras on the vehicles had an angle to capture the "take down."

"In making a qualified immunity determination," the Court must "review[] the facts in the light most favorable to" the plaintiff. *Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016). And here, Mr. St. Clair offers an altogether different version of events than the officers. He testified at his deposition that, immediately after the dog began to bite him, he "gave up" and "wasn't resisting." (Doc. 110-5 at 67, 69). Despite his lack of resistance, officers allegedly "swarm[ed] around" him and began punching him in the face. (*Id.* at 57-59). According to Mr. St. Clair, the punches continued even after he was handcuffed and had shouted, "You're killing me, you're hurting me." (*Id.* at 23, 57). Indeed, one officer allegedly "kicked [him] in the testicles after [he] had the handcuffs on." (*Id.* at 23). Mr. St. Clair also claimed that, during this time, officers "beat[] [him] with batons" and kept "whacking" and "hitting" him. (*Id.* at 70). The encounter allegedly lasted fifteen to twenty seconds, and the handcuffs "were on [Mr. St. Clair] within the first couple seconds." (*Id.* at 62).

Not all of the excessive-force factors point in the same direction here. Nevertheless, a reasonable jury could conclude from Mr. St. Clair's deposition testimony that Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom used excessive force when they arrested Mr. St. Clair. The first factor—the severity of the crime—supports the officers. Before his arrest, Mr. St. Clair led police on a dangerous, high-speed car chase

during which he endangered the lives of several people and attempted to intimidate an officer by driving at his vehicle. Mr. St. Clair stated he "rammed" an officer. (Doc. 110-5 at 30). That is not clear on this record. "[E]luding an officer—a felony under Florida law—is a very serious crime"; so is aggravated assault on a law enforcement officer. *Williams v. Sirmons*, 307 F. App'x 354, 361 (11th Cir. 2009). This factor therefore favors the officers.

On balance, the second factor—the threat to officer safety—favors Mr. St. Clair. To be sure, Mr. St. Clair posed a threat to law enforcement before he was subdued and stopped resisting. "But he posed no immediate threat at the time the officers administered the [blows] that underlie [his] constitutional claim—which, construing the facts in the light most favorable to [Mr. St. Clair], occurred after [he] had been taken to the ground and subdued and was no longer resisting." *Acosta v. Miami-Dade Cnty.*, No. 22-11675, --- F.4th ----, 2024 WL 1326641, at *4 (11th Cir. Mar. 28, 2024) (citation omitted); *see also Burch v. City of Florence*, 913 F. Supp. 2d 1221, 1247 (N.D. Ala. 2012) (noting that "[t]he reasonableness of the force applied [] is measured as of the precise moment it is administered").

The third factor—whether Mr. St. Clair was resisting or evading arrest—favors him as well. Of course, Mr. St. Clair did resist arrest and attempt to evade law enforcement when he exited the truck and began to run. But, according to Mr. St. Clair, he stopped resisting and "gave up" once he was taken to the ground. Despite his lack of resistance, officers allegedly punched him in the face, beat him with batons, and—even after he was handcuffed—kicked him in the testicles. Because, in Mr. St. Clair's version of events, he was no longer "actively resisting arrest or attempting to flee once he was taken to the

ground and subdued," this factor suggests that the officers used excessive force when they arrested him. *Acosta*, 2024 WL 1326641, at \*4.

The fourth and fifth factors—the need for and amount of force used—likewise favor Mr. St. Clair. It is true that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. But "even assuming that there was a 'need' to use force in order to get [Mr. St. Clair] to the ground, that need dissipated once he was on the ground" and, according to him, no longer resisting. *Acosta*, 2024 WL 1326641, at \*5. Likewise, if at this point "there was no need to use any meaningful force, then the 'relationship' between that non-need and the amount of force used is zero. Any further [blows] at that point [were] unnecessary." *Id.*

The last factor—the extent of the injury inflicted—is inconclusive. Mr. St. Clair testified that he suffered a number of serious injuries from the officers' blows. Specifically, he claimed that "he lost a lot of teeth," his nose was broken, his eyes were swollen shut, "some" ribs were broken, and one of his testicles was "swoll[en] up real bad." (Doc. 110-5 at 24, 81-83). But the hospital records from Mr. St. Clair's visit to the emergency room do not appear to corroborate these alleged injuries. The records do reflect "bruising to the right side of [Mr. St. Clair's] face," but nothing suggests that this was a serious or substantial injury. (Doc. 110-2 at 14). The tape of Mr. St. Clair after the arrest does appear to show injuries consistent with taking hard punches to the face. (Doc. 108-4, Martin Dashcam Video at 20:00-27:46). And it is clear these happened when the K-9 (appearing to be a German Shepherd) had a bite emplaced on his arm. This factor is therefore neutral.

Considering the totality of the circumstances, and viewing the facts in the light most favorable to Mr. St. Clair, a reasonable jury could conclude that Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom violated Mr. St. Clair's right to be free from excessive force.[5] Defendants who "run" from police (even outrageously) may not receive a beating as punishment for running; and viewing the evidence in favor of the non-movant, a reasonable jury could find this happened.

The question thus becomes whether, "at the time of the alleged conduct," these officers violated "clearly established law." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). The answer to that question is yes. "A plaintiff may show that a right was clearly established through: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) (internal quotation marks omitted).

A "broad statement of principle" controls here. *Id.* Any reasonable officer would have known in April 2019 that "gratuitous use of force when a criminal suspect is not

---

[5] At his deposition, Mr. St. Clair was unable to identify the officers who struck him. That failure is not fatal to his excessive-force claim. The seven officers listed above admit to laying hands on Mr. St. Clair during his arrest. And Mr. St. Clair testified that the officers who physically apprehended him used a disproportionate amount of force. Mr. St. Clair's testimony, "taken in the light most favorable to him, as [the Court] must on summary judgment, create[s] a triable issue of fact as to whether one or [more] of the officers used excessive force upon him." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007) ("Apparently, the district court agreed with the officers that because [plaintiff] did not see who beat him, if anyone did, there would be no evidence at trial from which a jury might assign liability for the beating. This is not the law. Were this the law, all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence.").

- 14 -

resisting arrest constitutes excessive force." *Ingram v. Kubik*, 30 F.4th 1241, 1252 (11th Cir. 2022); *see also Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."). Indeed, the Eleventh Circuit recently held that "it was clearly established in February 2014 that a police officer is prohibited from using force against a non-resisting suspect." *Acosta*, 2024 WL 1326641, at *5.

Under Mr. St. Clair's version of the facts, the officers continued to beat him even after he "gave up" and stopped resisting. "[C]ase law bars [these] alleged actions with sufficient clarity to put any reasonable officer on notice that this conduct constituted excessive force." *Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019). Accordingly, Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom are not entitled to qualified immunity for the excessive force they allegedly employed when they physically apprehended Mr. St. Clair.[6]

### 2. Sgt. Peterman's Deployment of the K-9

---

[6] Defendants contend that the excessive-force claim fails because the officers applied only *de minimis* force. (Doc. 110 at 13-14). "[T]he application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013) (internal quotation marks omitted). "But this principle has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." *Saunders*, 766 F.3d at 1269-70. Under Mr. St. Clair's version of the facts, that is what happened here.

Sgt. Peterman is, however, entitled to summary judgment, whether outright or based upon qualified immunity, for his use of the K-9 to subdue Mr. St. Clair.[7] Immediately after Mr. St. Clair exited the truck, Sgt. Peterman opened the driver's side door of his vehicle and ordered his K-9 to "bite" Mr. St. Clair. (Doc. 109-14 at 3; *see also* Doc. 108-3, Martin Dashcam Video at 14:00-20). Mr. St. Clair ran for approximately thirty feet before the dog caught up with him and began to bite his left forearm. (Doc. 110-5 at 65; *see also* Doc. 108-2, Gulledge Dashcam Video at 14:21-38). At one point, Mr. St. Clair looked around to see the dog, and kept running. (Doc. 108-2, Gulledge Dashcam Video at 14:21-38). Mr. St. Clair estimated that the dog bit him for five to ten seconds; Sgt. Peterman said the dog held the bite for fifteen to thirty seconds. (Doc. 109-14 at 3; Doc. 110-5 at 62). There is no evidence the dog mauled Mr. St. Clair.

No reasonable jury could conclude that Sgt. Peterman's use of the K-9 constituted excessive force. When Sgt. Peterman released the dog, Mr. St. Clair had just led police on a dangerous, high-speed car chase. Sgt. Peterman thus "had reason to believe that [Mr. St. Clair had committed several] serious felony crimes," including fleeing or eluding law enforcement. *Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008). Moreover, when Sgt. Peterman released the K-9, Mr. St. Clair clearly "pose[d] an immediate threat to the safety of the officers [and] others." *Mobley*, 783 F.3d at 1353. As noted above, Mr. St. Clair had just endangered the lives of law enforcement and members of the public by leading officers on a high-speed car chase. And once that chase ended, Mr. St. Clair

---

[7] Counsel for Mr. St. Clair conceded at oral argument that the decision to release the K-9 was not unconstitutional. Nevertheless, the Court considers the issue here for the sake of completeness.

immediately began to flee on foot. Mr. St. Clair was fleeing on foot (and gave the undersigned the impression on the tape that he might leap over the overpass fence onto the interstate highway below). In these circumstances, Sgt. Peterman "reasonably could have believed that [Mr. St. Clair] posed a significant threat to officer safety and to the safety of others." *Jay v. Hendershott*, 579 F. App'x 948, 953 (11th Cir. 2014).

Likewise, when Sgt. Peterman released the K-9, Mr. St. Clair was plainly "attempting to evade arrest by flight." *Mobley*, 783 F.3d at 1353. Indeed, it is undisputed that, once he exited the truck, Mr. St. Clair began to flee on foot from the police. "[T]he use of a canine is objectively reasonable where," as here, a suspect "attempt[s] to flee" after committing multiple serious felonies. *Morris v. City of Lakeland*, No. 8:21-cv-2280-VMC-CPT, 2023 WL 2403883, at *7 (M.D. Fla. Mar. 8, 2023) (collecting cases).

The remaining factors all favor Sgt. Peterman. The "need for the application of force" was unmistakable. *Mobley*, 783 F.3d at 1353. Sgt. Peterman was faced with a fleeing suspect who had stolen a pickup truck and led police on a high-speed car chase. And the use of the K-9 was consistent with that need—Sgt. Peterman "deployed a non-lethal police dog to subdue a recalcitrant suspect who had fled from [] officers" and endangered the lives of many people. *Moulton v. Prosper*, No. 18-61260-CIV, 2019 WL 4345674, at *5 (S.D. Fla. Sept. 12, 2019). Finally, although Mr. St. Clair suffered a dog-bite wound that ultimately required sutures, such an injury does "not make the canine force unconstitutional if warranted under the circumstances." *Baker v. Welker*, No. 09-60169-CIV, 2009 WL 10675096, at *5 (S.D. Fla. Nov. 30, 2009), *aff'd*, 438 F. App'x 852 (11th Cir. 2011). As

explained above, the deployment of the K-9 was appropriate to subdue a fleeing suspect who had just committed multiple serious felonies.[8]

In short, Sgt. Peterman's use of the K-9 was "reasonably tailored to the risk" that Mr. St. Clair presented when he exited the vehicle and began to flee. *Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012). Accordingly, Sgt. Peterman acted appropriately and is entitled to summary judgment based on the uncontested facts, as well as upon qualified immunity, for his decision to release the K-9.

### 3. The Remaining Defendants

The remaining Defendants—Public Safety Aid Mort and Officers Claxon, Fetz, Guptill, Harrison, Hutton, Jano, Jones, Kellerman, Liberty, Martin, Mulderrig, Sirera, and Smith—state that they either were not present during Mr. St. Clair's arrest or had no physical contact with him during his apprehension. (Doc. 109-2 at 2-3; Doc. 109-3 at 3; Doc. 109-5 at 2; Doc. 109-6 at 2; Doc. 109-7 at 2; Doc. 109-8 at 2; Doc. 109-9 at 3; Doc. 109-10 at 2; Doc. 109-11 at 2-3; Doc. 109-12 at 2; Doc. 109-13 at 2-3; Doc. 109-16 at 2; Doc. 110-4 at 14). Mr. St. Clair offers no evidence to rebut this testimony. Because no reasonable jury could find that these Defendants used any force against Mr. St. Clair, they

---

[8] The parties disagree about whether Sgt. Peterman issued a warning to Mr. St. Clair before releasing the K-9. "But neither the Supreme Court nor the Eleventh Circuit has imposed a hard-and-fast rule requiring warnings before *every* police dog deployment." *Moulton*, 2019 WL 4345674, at *5. To the contrary, "the Eleventh Circuit has affirmed an officer's deployment of a police dog *even without* the issuance of a warning." *Id.* (citing *Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008)). The undersigned finds that there was no reasonable opportunity or ability for an audible warning in this "wild and wooly" chase. Moreover, there is no evidence that Sgt. Peterman allowed the K-9 to attack Mr. St. Clair for an unduly prolonged period. The dog bit Mr. St. Clair for somewhere between five and thirty seconds, and Sgt. Peterman stated that he "commanded [the K-9] to release [the] bite as soon as [he] was confident that other means were available to ensure the safety of officers and the general public." (Doc. 109-14 at 3). Mr. St. Clair cites no caselaw—and this Court is aware of none—showing that Sgt. Peterman's use of the K-9 violated clearly established law.

are entitled to qualified immunity on the excessive-force claim. *See Hunter v. City of Leeds*, 941 F.3d 1265, 1282 (11th Cir. 2019) (where record lacked any evidence "to indicate that anyone other than [one officer]" used force against plaintiff, other officer-defendants were entitled to qualified immunity on excessive-force claim).

**B. Failure to Intervene**

Mr. St. Clair seeks to hold Defendants liable for "fail[ing] to stop the unprovoked and unjustified excessive use of force against [him] once he was no longer resisting arrest." (Doc. 89 at 8). "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (citation omitted). "But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so." *Id.* "Instances of force that occur within seconds do not place officers in a realistic position to intervene." *Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018).

As an initial matter, several Defendants state that they did not witness Mr. St. Clair's arrest. (Doc. 109-3 at 3; Doc. 109-5 at 2; Doc. 109-6 at 2; Doc. 109-7 at 2; Doc. 109-8 at 2; Doc. 109-9 at 3; Doc. 109-10 at 2; Doc. 109-12 at 2; Doc. 109-16 at 2; Doc. 110-4 at 14). For example, Officer Fetz claims that, although he was involved in the car chase, he "did not observe [Mr.] St. Clair's arrest by other officers" and "was not nearby when it occurred." (Doc. 109-3 at 3). Mr. St. Clair presents no evidence to rebut these Defendants' assertions that they were not present at the scene of the arrest. As a result, no reasonable jury could find that they were "in a position to intervene" in the alleged excessive force.

*Hadley*, 526 F.3d at 1330. Accordingly, Public Safety Aid Mort and Officers Fetz, Guptill, Harrison, Hutton, Jano, Jones, Kellerman, Liberty, Sirera, and Smith are entitled to summary judgment based both upon no proof and due to qualified immunity on the failure-to-intervene claim.

Mr. St. Clair also sues three officers who observed his arrest but claim not to have used any force against him—Officers Claxon, Martin, and Mulderrig. (Doc. 109-2 at 2-3; Doc. 109-11 at 2-3; Doc. 109-13 at 2-3). The claim against these officers fails because Mr. St. Clair presents no evidence that any of them was "in a realistic position to intervene" in the use of force. *Johnson*, 725 F. App'x at 878. According to Mr. St. Clair, the physical confrontation with the officers lasted only fifteen to twenty seconds. (Doc. 110-5 at 95). Thus, "any use of excessive force happened quickly and was over quickly." *Jackson v. City of Atlanta*, No. 22-12946, --- F.4th ----, 2024 WL 1472526, at *16 (11th Cir. Apr. 5, 2024). Moreover, Officers Claxon, Martin, and Mulderrig state that they "did not observe any officer . . . use any more force than appeared to be necessary to effect the safe arrest of" Mr. St. Clair. (Doc. 109-2 at 2-3; Doc. 109-11 at 3; Doc. 109-13 at 2). No reasonable jury could conclude that, in this fast-evolving situation, Officers Claxon, Martin, or Mulderrig had a realistic opportunity to assess the other officers' conduct, determine that their actions constituted excessive force, and then intervene in an appropriate and reasonable manner. *See Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023) ("[O]n-the-scene officers are often hampered by incomplete information and forced to make a split-second decision between action and inaction.").

Indeed, the facts of this case are a far cry from those in which the Eleventh Circuit has found a duty to intervene. *See, e.g.*, *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (finding that officer had "the time and ability to intervene" when he observed "a dog attack Plaintiff for at least two minutes"); *Bailey v. City of Miami Beach*, 476 F. App'x 193, 196 (11th Cir. 2012) (holding that officer "was able to do *something* to stop" a "beating [that] lasted for two to three minutes"); *King v. Reap*, 269 F. App'x 857, 860 (11th Cir. 2008) ("[Plaintiff] alleged that the beating took place for about twenty minutes. Therefore, each Appellant had the opportunity to observe that a handcuffed, non-violent suspect was being beaten but failed to intervene, violating his constitutional rights."); *cf. Jordan v. Georgia*, No. 20-13221, 2022 WL 4389006, at *4 (11th Cir. Sept. 22, 2022) ("If the stabbing lasted five to seven minutes, as [plaintiff] contends, and not '60 seconds,' as the officers contend, the officers had an opportunity to do something."). Therefore, Officers Claxon, Martin, and Mulderrig are entitled to summary judgment based upon no proof and upon qualified immunity on the failure-to-intervene claim.

Nor can Mr. St. Clair pursue a failure-to-intervene claim against the seven officers who admit to striking or otherwise touching him during the arrest. "Where a defendant is alleged or shown to have participated directly in an alleged constitutional violation, the proper claim is not for failure to intervene but instead for the underlying constitutional violation." *Degroat v. Felsman*, No. 3:16-cv-01186, 2019 WL 652345, at *4 (M.D. Pa. Feb. 15, 2019); *see also Cuellar v. Love*, No. 11-cv-3632-NSR, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014) ("Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is

inapplicable."). Here, Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom admit that they directly participated in the use of force that underlies Mr. St. Clair's excessive-force claim. Accordingly, they are entitled to summary judgment on the failure-to-intervene claim.[9] *See Degroat*, 2019 WL 652345, at *4 ("Defendants cannot be liable under a failure to intervene theory because the undisputed evidence shows they were all directly involved in the use of force.").

### C. Deliberate Indifference to Serious Medical Needs

Lastly, Mr. St. Clair contends that Defendants were deliberately indifferent to his serious medical needs in the immediate aftermath of his arrest. Specifically, he complains that Defendants "withheld any examination or treatment at the scene by first responders," instead "load[ing] [him] into the back of a patrol car to take him to the emergency room, where he received his first medical assessment." (Doc. 111 at 15).

"The Due Process Clause of the Fourteenth Amendment requires government officials to provide medical aid to individuals who have been injured during an arrest." *Wade v. Daniels*, 36 F.4th 1318, 1326 (11th Cir. 2022). "To succeed on a claim for deprivation of medical care, a plaintiff must prove (1) the existence of an objectively serious medical need, and (2) that the officer was deliberately indifferent to that need." *Id.* "A serious medical need is one that has been diagnosed by a physician as mandating

---

[9] In his supplemental brief, Mr. St. Clair appears to contend that Defendants are liable for failure to intervene because they did not "report[] the excessive force." (Doc. 121 at 6). This argument lacks merit. A failure-to-intervene claim requires proof that an officer had "the ability to intervene to *prevent* th[e] use of force." *Baker v. City of Madison*, 67 F.4th 1268, 1281 (11th Cir. 2023) (emphasis added). Of course, reporting the alleged misconduct after the fact could not have prevented any use of force by the officers who apprehended Mr. St. Clair.

treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (internal quotation marks omitted). "To prove deliberate indifference, the plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Wade*, 36 F.4th at 1326 (internal quotation marks omitted).

The Court assumes, without deciding, that Mr. St. Clair's post-arrest injuries—including the dog bite—qualified as serious medical needs. Defendants are nonetheless entitled to summary judgment because there is no evidence that they acted with deliberate indifference to Mr. St. Clair's medical needs. After Mr. St. Clair was subdued, officers placed him in the back of a patrol car and drove him to a nearby hospital where he received treatment for his injuries. (Doc. 110-5 at 84-85, 87). Mr. St. Clair himself admitted at his deposition that he arrived at the hospital within ten to twenty minutes of his arrest. (*Id.* at 87). He contends, however, that the officers violated the constitution because they failed to arrange for his immediate "examination or treatment at the scene by first responders." (Doc. 111 at 15). The pertinent tape shows he was sitting upright, conscious, but ailing and crying. (Doc. 108-4, Martin Dashcam Video at 20:00-27:46). He looked like he had taken some hard face punches. (*Id.*) He was not bleeding visibly (although he had a dog bite at the scene that had some sort of paper bandage on it). (*Id.*) Some distress could have been

caused by the methamphetamine he had ingested. Presumably one does not normally eat methamphetamine.

In effect, Mr. St. Clair complains about a delay in treatment. "An arrestee who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 512 (11th Cir. 2010) (internal quotation marks omitted); *see also Taylor v. Adams*, 221 F.3d 1254, 1259-60 (11th Cir. 2000) (noting that a delay in treatment can support a constitutional violation "where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified"). Mr. St. Clair presents no evidence that any of his injuries were "seriously exacerbate[d]" because law enforcement took him to a hospital ten to twenty minutes after his arrest rather than having him treated by first responders at the scene. *Taylor*, 221 F.3d at 1259-60. Nor is there any indication that Defendants were aware that Mr. St. Clair's injuries required immediate treatment by paramedics. In all, the officers did take him to the hospital without unreasonable delay. In these circumstances, no reasonable jury could conclude that Defendants "disregarded the risk of serious harm" posed by Mr. St. Clair's injuries. *Wade*, 36 F.4th at 1326.

Moreover, it is unclear whether any first responders were actually present at the scene of the arrest. Mr. St. Clair testified at his deposition that he saw "people in white shirts" and "an ambulance or a fire rescue truck or something." (Doc. 110-5 at 75). Nothing in the record corroborates these vague assertions. But even if first responders were on the

scene, Mr. St. Clair cannot show that Defendants displayed deliberate indifference to his medical needs by promptly taking him to the hospital rather than having him treated at the scene. Accordingly, Defendants are entitled to qualified immunity on the claim for deliberate indifference to serious medical needs.

## IV.   Conclusion

Accordingly, it is **ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Docs. 110, 115), is **GRANTED in part** and **DENIED in part**.

   a. The Motion is **GRANTED** as to (1) the excessive-force claim against Sgt. Peterman for deploying the K-9; (2) the excessive-force claim against Public Safety Aid Mort and Officers Claxon, Fetz, Guptill, Harrison, Hutton, Jano, Jones, Kellerman, Liberty, Martin, Mulderrig, Sirera, and Smith; (3) the failure-to-intervene claim; and (4) the claim for deliberate indifference to serious medical needs.

   b. The Motion is **DENIED** as to the excessive-force claim against Sgt. Peterman and Officers Anthony, Gulledge, King, Rex, Simmons, and Strom for the force they used in physically apprehending Mr. St. Clair. This matter is for the jury.

2. The Clerk is directed to **TERMINATE** Public Safety Aid Mort and Officers Claxon, Fetz, Guptill, Harrison, Hutton, Jano, Jones, Kellerman, Liberty, Martin, Mulderrig, Sirera, and Smith as Defendants in this case.

**DONE** and **ORDERED** in Tampa, Florida, on April 15, 2024.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE